# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| DON'E WHITE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 1:04CV00051 ERW |
| | ) |
| ROBERT HAMPTON, GLEN BABICH, | ) |
| and GALE BAILEY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter comes before the Court upon Plaintiff's Motion for Summary Judgment [doc. #33] and Defendants' Motion for Summary Judgment [doc #36]. Plaintiff is a prisoner with the Missouri Department of Corrections and is representing himself in this action. He has filed this suit seeking damages pursuant to 42 U.S.C. § 1983 for Defendants' alleged deliberate indifference to his serious medical need in violation of his Eighth Amendment right to be free from cruel and unusual punishment. Defendants are medical personnel at two penitentiaries where Plaintiff has been incarcerated. For the reasons below, Defendants' motion is granted and Plaintiff's motion is denied.

## I.     BACKGROUND

Plaintiff is presently confined with the Missouri Department of Corrections in the Southeast Correctional Center ("SECC"). A portion of Plaintiff's complete medical history (Ex. A - Complete Medical Record History) dating from January 1999 and leading up to August 2002,

1

when his first complaint relevant to this action arose, reveals that Plaintiff complained of and was treated for numerous ailments, including, *inter alia*, arthritis (Def.'s Ex. A at 020, 028, 113), musculoskeletal pain (Def.'s Ex. A at 025, 027, 058, 083), chronic headaches (Def.'s Ex. A at 057, 087, 101, 105, 111, 128, 131, 134-35), asthma and other respiratory problems (Def.'s Ex. A at 009, 014, 053, 054, 066, 089, 095, 109, 112, 118, 119, 121, 125, 128, 129), hypertension (Def.'s Ex. A at 014, 025, 055, 067, 078, 088, 110), hemorrhoids (Def.'s Ex. A at 045, 083), gastrointestinal disorders (Def.'s Ex. A at 025, 044, 069, 080, 090), irritable bowel syndrome (Def.'s Ex. A at 093), urinary disorders (Def.'s Ex. A at 050, 053), cardiac problems (Def.'s Ex. A at 027, 077), recurring left ear pain (Def.'s Ex. A at 018-19, 057, 103-104, 131), a shortened leg (Def.'s Ex. A at 033, 042, 068, 095-99, 102, 111), skin disorders (Def.'s Ex. A at 061, 093, 128, 131), weight loss (Def.'s Ex. A at 082), hearing and vision problems (Def.'s Ex. A at 023, 041, 049, 060, 068, 087, 091, 098, 101, 113, 116), and several mental health problems (Def.'s Ex. A at 010, 014, 016, 045, 048, 063). There were also instances where Plaintiff claimed to have a light heart attack (Def.'s Ex. A at 033, 077), pneumonia (Def.'s Ex. A at 031), and seizures from a head injury (Def.'s Ex. A at 014, 048 (denied injury), 053, 063, 111 (reasserted existence of injury)), none of which was supported in the medical record or by any other evidence.

During July and August 2001, Plaintiff complained of and was treated for a cystic growth on his nose. (Def.'s Ex. A at 087-97). After he was informed that the cyst was benign, he made no further complaints about it. (Def.'s Ex. A at 097). On June 3, 2002, while Plaintiff was confined at the Moberly Correctional Center ("MCC"), Dr. Robert Hampton found a swollen

node beneath Plaintiff's left ear.[1]  (Def.'s Ex. A at 127).  On August 9, 2002, Plaintiff filed a Medical Service Request ("MSR") complaining of an earache and saw a nurse the next day, who also noted swelling beneath Plaintiff's left ear.  (Def.'s Ex. A at 138).  Dr. Hampton saw him on August 28 and found no evidence of ear infection or swelling around the ears.  (Def.'s Ex. A at 141).  On September 9, 2002, Plaintiff saw a nurse for two small knots in his armpit and another on his head.  (Def.'s Ex. A at 145).  On September 16, Dr. Hampton found that the armpit knots were healing, but Plaintiff was concerned about the knot beneath his left ear, so Hampton referred him to a specialist, Dr. Benjamin Gaddy.  (Def.'s Ex. A at 145-46).

After examining Plaintiff on October 16, 2002, Dr. Gaddy noted generalized swelling over the parotid gland, but could feel no definite firm mass and ruled out a tumor.  (Def.'s Ex. A at 151).  He recommended a CT scan of Plaintiff's head and neck, but advised a guided needle biopsy only if a "discrete mass" was noted.  (Def.'s Ex. A at 151).  CT scans of Plaintiff's head and neck, taken at Moberly Medical Center on October 24, 2002, showed "a few small enhancing serpiginous structures,"[2] but "no abnormal mass" and concluded that the growth "may represent a small hemangioma."[3]  (Def.'s Ex. C - Moberly Regional Medical Center X-Ray Report).  Dr. Hampton reviewed the scans with Plaintiff on November 5, 2002, noted inflammation and drainage in Plaintiff's left ear, and prescribed antibiotics and ear drops.  (Def.'s Ex. A at 150;

---

[1] This is contrary to Defendants' assertion that no growth was found until August 10, 2002.  However, because this was not Plaintiff's main complaint, and it was not causing him pain, no treatment was prescribed at that time.

[2] A "serpiginous structure" is a creeping lesion with a wavy or serpent-like border.  Stedman's Medical Dictionary 1624 (27th ed. 2000).

[3] A "hemangioma" is a proliferation of blood vessels in a concentrated area, leading to a mass that resembles, but is not, a tumor.  Stedman's Medical Dictionary 795 (27th ed. 2000).

3

Def.'s Ex. B - Correctional Medical Services' Medication Administration Record). He also ordered staff to fax a copy of the CT scans to Dr. Gaddy for his recommendations. (Def.'s Ex. A at 150). This fax was apparently not sent, and prison medical administrators later apologized for this failure. (Pl.'s Ex. B-1).

In November and December, 2002, Plaintiff continued to seek and receive treatment for various medical needs, including headaches (for which he refused to take the prescribed medicine), dental care, a flu vaccination, and treatment for eye irritation and hypertension. (Def.'s Ex. A at 153-160; Def.'s Ex. B). On December 9, Plaintiff complained of left ear pain and requested the results of his CT scan (which, according to the record, had already been discussed with him). (Def.'s Ex. A at 158-59). The examining nurse noted a general swelling on the left side of the face and referred him to the doctor based on his recurrent ear infection, but could not feel a "tumor" below Plaintiff's left ear as he claimed. (Def.'s Ex. A at 158). Dr. Hampton saw Plaintiff the next day, found that the ear infection was gone, and reassured Plaintiff that the growth was not dangerous. (Def.'s Ex. A at 162). Dr. Hampton also "discussed the benign nature of hemangiomata and the bloody nature of any surgery." (Def.'s Ex. A at 162).

On December 17, 2002, Plaintiff sustained a fractured jaw in an altercation with another inmate and was immediately taken to the Transitional Care Unit ("TCU"), where he underwent x-rays and treatment for pain. (Def.'s Ex. A at 163-70; Def.'s Ex. C; Def.'s Ex. D - Patient Notes). The next day, Plaintiff had maxillofacial surgery performed by specialist Dr. Richard Graham in order to stabilize the fracture and wire his jaw closed. He was returned to the TCU the same day. (Def.'s Ex. D; Def.'s Ex. A at 170). Plaintiff was treated in the TCU until December 21, 2002 when he was transferred to the TCU at Northeast Correctional Center ("NECC"). (Def.'s Ex. A

at 170-77). Plaintiff manifested some concern about his transfer, wondering if he was being "sent to this camp to die" based on his "previous cardiac test" and the "tumor in his artery,"[4] but was reassured that his transfer was simply due to overcrowding at Moberly's TCU. (Def.'s Ex. A at 177-78). Plaintiff received continuous care and treatment during his time at NECC (despite reportedly removing the stabilizing bands on his teeth), and was transferred back to MCC five days later on December 26, 2002. (Def.'s Ex. A at 177-183).

Plaintiff continued to receive care for his fractured jaw after his return to Moberly's TCU based on various complaints of pain and swelling, as well as unrelated ailments. (Def.'s Ex. A at 183-191). On December 30, Plaintiff claimed to have re-fractured his jaw in a fall during the night. (Def.'s Ex. A at 191). When asked about the fall, Plaintiff offered no further information but stated "my jaw was not fixed right to start with, they never should have used rubberbands [sic], that is not standard procedure for the break I had," supporting the statement by claiming he was only "6 months away from having a doctors [sic] degree." (Def.'s Ex. A at 191). Dr. Hampton saw him the next day and referred him to Dr. Graham, who performed an x-ray and found fractured plating screws in Plaintiff's left jaw. (Def.'s Ex. A at 194; Def.'s Ex. D). On January 3, 2003, the screws were replaced and the fracture was re-plated. (Def.'s Ex. D).

From the time of his jaw fracture until his transfer to SECC on February 15, 2003, Plaintiff was treated for numerous complaints and ailments, including, *inter alia*, constipation, hemorrhoids, a small laceration on his toe, headaches, pain in his ear, and nauseousness. (Def.'s Ex. A at 177-273). During this time, Plaintiff continued regular follow-up visits with Dr. Graham

---

[4]Plaintiff repeatedly refers to this growth as a tumor in his artery, indicating that he may have misunderstood the nature of hemangiomata. It will be described herein simply as a growth.

5

for his jaw surgery. (Ex. D). However, he did not complain about the growth on his neck during this two month period, nor did Dr. Hampton note any swelling, infection, or growth of the hemangioma.[5] (Def.'s Ex. A at 177-273).

After meeting with several doctors in his first month at SECC, including a specialist who rewired his jaw, Plaintiff saw Dr. Glen Babich on March 16, 2003. (Def.'s Ex. A at 273-291). At that time, Plaintiff complained of jaw pain and nothing else. (Def.'s Ex. A at 291). Plaintiff continued to receive care from Dr. Babich for various ailments and complaints over the next eight months, particularly his jaw problems. (Def.'s Ex. A at 290-351). In spite of Plaintiff manipulating, breaking, and removing his jaw wiring, Dr. Babich continued to treat him for the problems with his jaw. (Def.'s Ex. A at 321-22).

During this time, Plaintiff was going through the offender grievance process to have his CT scan reviewed by Dr. Gaddy (Pl.'s Ex. B-2); however, Correctional Medical Services administrators admitted this was not done. Plaintiff's medical records indicate that he did not voice any concerns to Dr. Babich about his hemangioma again until October 13, 2003. (Def.'s Ex. A at 351). Dr. Babich requested the June 2002 CT scan of Plaintiff's head and neck, for which Plaintiff signed a release on November 4, but MCC apparently had some difficulty locating the scan.[6] (Def.'s Ex. A at 357). Unable to get the June 2002 CT scan results, Dr. Babich ordered a new CT scan on December 4, 2003 which was performed at Vista Imaging on

---

[5] Plaintiff disputes this and cites to two MSRs among his exhibits. However, these MSRs are dated November 11, 2002 and December 9, 2002, both prior to his jaw fracture.

[6] MCC responded to Dr. Babich's request by stating that they had "no record of this PT at MRMC [Moberly Regional Medical Center], no such name, SS#, or DOB." (Def.'s Ex. A at 357).

6

December 22. (Def.'s Ex. A at 361). This scan reported a nonpathologic lymphadenopathy.[7] (Def.'s Ex. A at 362). There is no record of when the results were reviewed with Plaintiff, but they were likely reviewed on February 7, 2004.[8] (Def.'s Ex. A at 365).

Plaintiff did not complain about the growth again until July 2, 2004, when he informed Dr. Babich that his mother had died of a rare, malignant tumor (which he later identified as a rabdomyosarcoma[9]) that started at her ear. (Def.'s Ex. A at 381). In comparing the 2003 CT scan with the earlier scan (which had since been located), Dr. Babich noted that the growth had actually decreased in size. (Def.'s Ex. A at 382). Nevertheless, he requested another CT scan. The request was denied by a medical administrator because the last scan was only six months earlier, and there was no indication of change that would necessitate a new scan. (Def.'s Ex. A at 381-82). On July 21, 2004, Dr. Babich informed Plaintiff that his request for another CT scan had been denied because the other two showed no malignancy and there had been no increase in its size. (Def.'s Ex. A at 385). Dr. Babich examined Plaintiff again on August 16, 2004, and found "no palpable cervical lymph nodes or mass today," but requested that copies of both CT scans be faxed to Dr. Gaddy for confirmation of the diagnosis. (Def.'s Ex. A at 390-91).

---

[7]"Nonpathologic lymphadenopathy" indicates an abnormal enlargement of the lymph nodes not caused by any particular disease. Stedman's Medical Dictionary, "pathologic" at 1332 and "lymphadenopathy" at 1038-39 (27th ed. 2000).

[8]Plaintiff filed a complaint on February 2, 2004 asking to see his CT scan results, then saw Dr. Rodriguez on February 7. (Def.'s Ex. A at 365). The record does not contain any information about the substance of this meeting, but Plaintiff's complaints to see his CT scan ceased thereafter. (Def.'s Ex. A at 365-81).

[9]"Rhabdomyosarcoma" is a malignant growth derived from skeletal (striated) muscle that occurs more commonly in children than adults. Stedman's Medical Dictionary 1565 (27th ed. 2000).

7

On April 16, 2004, prior to the denial of his request for a third CT scan, Plaintiff filed a complaint with this Court alleging that the prison medical staff at MCC and SECC refused to treat the growth on the left side of his neck, and then covered up their refusal to treat him. On June 21, 2004, Defendants filed an answer advancing four affirmative defenses. Following discovery, Plaintiff filed a motion for summary judgment on November 16, 2004. Defendants then filed a cross motion for summary judgment on December 15, 2004, as well as a response to Plaintiff's motion. On January 6, 2005, Plaintiff filed a reply to Defendants' response and a response to Defendants' motion. Plaintiff also filed a surreply on February 9. Both parties' motions for summary judgment will be considered herein.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Crumley v. City of St. Paul, 324 F.3d 1003, 1006 (8th Cir. 2003). The United States Supreme Court has noted that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 1).

"'By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact.'" Hufsmith v. Weaver, 817

F.2d 455, 460 n.7 (8th Cir. 1987) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis added by Supreme Court)). Material facts are "those 'that might affect the outcome of the suit governing law.'" Id. (quoting Anderson, 477 U.S. at 247-48). Summary judgment will be denied due to a material issue of genuine fact if "the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Crumley, 324 F.3d at 1006. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23, quoted in St. Jude Med., Inc. v. Lifecare Int'l., Inc., 250 F.3d 587, 595 (8th Cir. 2001).

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. Crumley, 324 F.3d at 1006 (citing Lynn v. Deaconess Med. Ctr.-W. Campus, 160 F.3d 484, 487 (8th Cir. 1998)). The burden then shifts to the non-moving party who must set forth specific evidence showing that there is a genuine dispute as to material issues. Anderson, 477 U.S. at 249. To meet its burden, the non-moving party may not rest on the pleadings alone and must "do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.

In analyzing summary judgment motions, the court must view the evidence in the light most favorable to the non-moving party. Crumley, 324 F.3d at 1008. The non-moving party is given the benefit of any inferences that can logically be drawn from those facts. Matsushita, 475 U.S. at 586. The court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." Kampouris v. St. Louis Symphony Soc., 210 F.3d 845, 847 (8th Cir. 2000). The court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record

generating a genuine issue of material fact for trial on each essential element of a claim." Id.

### III. ANALYSIS

Plaintiff brings this suit pursuant to 42 U.S.C. § 1983, which states, *inter alia*, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]

Plaintiff claims that Defendants violated his Eighth Amendment constitutional right to be free from cruel and unusual punishment. In Estelle v. Gamble, the Supreme Court held that the Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency...against which we must evaluate penal measures...which involve the unnecessary and wanton infliction of pain." 429 U.S. 97, 102-03 (1976) (internal citations and quotations omitted). For this reason "[t]he government is obligated to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002) (quoting Estelle, 429 U.S. at 103). It is a violation of the Eighth Amendment to deny medical care for serious medical needs when the denial results in pain and suffering that serves no penological purpose. Estelle, 429 U.S. at 103.

Specifically, in order to find an Eighth Amendment violation, the inmate has the burden of proving both a subjective and objective component. Choate v. Lockhart, 7 F.3d 1370, 1374 (8th Cir. 1993). First, the prison official must deprive the inmate of a right that is objectively "sufficiently serious" to rise to the level of a constitutional violation. Farmer v. Brennan, 511 U.S. 825, 834 (1994). The "act or omission must result in the denial of the minimal civilized measure of life's necessities." Id. (internal quotations omitted). Second, the "prison official must have a sufficiently culpable state of mind." Id. (internal quotations omitted). "[T]hat [subjective]

state of mind is one of 'deliberate indifference' to inmate health or safety." Id. Deliberate indifference exists when the prison official "knew of, yet disregarded, an excessive risk to his health." Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (quoting Logan v. Clarke, 119 F.3d 647, 649 (8th Cir. 1997). Therefore, for Plaintiff to succeed in his claim that Defendants were deliberately indifferent, he "must evidence (1) he suffered from a serious medical condition, (2) defendants knew of the condition, and (3) defendants deliberately disregarded the condition." Kitchen v. Miller, 343 F.Supp.2d 820, 823 (E.D. Mo. 2004).

A serious medical need exists when a person "has been diagnosed by a physician as requiring treatment or [the need] is so obvious that even a lay person would easily recognize the need for a doctor's attention." Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995). Deliberate "indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-05. It may be considered deliberate indifference if a prison physician chooses "an easier and less efficacious course of treatment." Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990). Similarly, cursory treatment of a serious medical condition may also constitute deliberate indifference. Starbeck v. Linn County Jail, 871 F.Supp. 1129, 1145 (N.D. Iowa 1994). However, just because the inmate's medical treatment may be considered "conservative," does not necessarily mean that the physician has acted with deliberate indifference. Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994). Similarly, "[m]ere negligence is not sufficient to support a cause of action[.]" Davis v. Hall, 992 F.2d 151, 153 (8th Cir. 1993). Indeed, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle, 97 U.S. at 106. Treatment will only be considered inadequate if it is "grossly inappropriate or evidenced intentional maltreatment." Dulany v. Carnahan, 132 F.3d 1234, 1241 (8th Cir. 1997).

11

Certain decisions are made using independent medical judgment. See Estelle, 97 U.S. at 107. Federal courts are reluctant to second guess treatment decisions made by competent physicians. Bouchard v. Magnusson, 715 F.Supp. 1146, 1149 (D. Me. 1989). "Disagreement with a medical judgment is not sufficient to state a claim for deliberate indifference to medical needs." Davis, 992 F.2d at 153.

### A. Serious Medical Condition

Plaintiff claims that the growth on his neck is a serious medical condition such that prison medical staff's failure to treat it constituted deliberate indifference. A serious medical need exists when a person "has been diagnosed by a physician as requiring treatment or [the need] is so obvious that even a lay person would easily recognize the need for a doctor's attention." Camberos, 73 F.3d at 176. Once Dr. Hampton identified this growth, he sent Plaintiff to a specialist to have it examined. This specialist, Dr. Gaddy, determined that the growth was not a tumor because he did not find any discrete mass. He diagnosed the growth as a benign hemangioma and recommended a CT scan to confirm this. The CT scan found no abnormal mass, confirming Dr. Gaddy's diagnosis.

Later examinations by Dr. Babich revealed the growth had not increased in size. In fact, a subsequent CT scan noted that, if anything, it was getting smaller. The growth was not changing and was not harmful, so no further treatment was required at that time. The CT scans describe the growth as 1 to 1 ½ cm in diameter, which would hardly seem to require attention even according to a lay person. At no time did Plaintiff or any of the medical personnel receive any indication that the growth was harmful or even threatening to become harmful to Plaintiff's health. Because the growth was repeatedly and consistently diagnosed as harmless, its treatment cannot qualify as a "serious medical need." See Jackson v. Fauver, 334 F.Supp.2d 697, 736 (D.N.J. 2004) (benign growth in nasal cavity not a serious medical need).

### B. Deliberate Indifference to Plaintiff's Growth

Even assuming that Plaintiff's growth was a serious medical need, Plaintiff claims that Dr. Hampton and Dr. Babich were deliberately indifferent to his growth because (1) Dr. Hampton ignored a specialist's recommendations regarding his growth, (2) Dr. Hampton failed to send the results of his CT scan to the specialist, (3) all Defendants ignored or delayed his treatment, and (4) all Defendants covered up the failure to properly treat him.

Plaintiff claims that Dr. Hampton was deliberately indifferent to his serious medical needs by allegedly ignoring a specialist's recommendations and treatment plan for the growth on Plaintiff's neck. However, Plaintiff has failed to demonstrate that Dr. Hampton "knew of, yet disregarded, an excessive risk to his health." See Keeper, 130 F.3d at 1314. The specialist, Dr. Gaddy, recommended a CT scan of Plaintiff's head and neck, but advised a guided needle biopsy only if a "discrete mass" was noted. (Ex. A, 151). CT scans of Plaintiff's head and neck found "no abnormal mass," so based on Dr. Gaddy's recommendations, the guided needle biopsy was not necessary. Plaintiff has put forth no evidence that Dr. Hampton disregarded Dr. Gaddy's recommendations. Furthermore, assuming *arguendo* that Dr. Hampton did disregard the recommendations of Dr. Gaddy, when a prison physician fails to follow the recommendations of outside specialists, the prison doctor will not be displaying deliberate indifference if the doctor used his 'independent professional judgment' when choosing the particular course of treatment. Dulany, 132 F.3d at 1240.

Plaintiff makes much of Defendants' failure to contact Dr. Gaddy with the results, pointing to a letter of apology from the administration and claiming that the failure was a deliberate coverup. However, the record indicates that Dr. Hampton requested the CT scan results be faxed to Dr. Gaddy on November 5, 2002. If they were not sent despite Hampton's request, this was simply a miscommunication. See Bender v. Regier, 385 F.3d 1133, 1138 (8th

13

Cir. 2004) (miscommunication between doctors about the ordering of treatment is at most evidence of negligence, not deliberate indifference). Additionally, given Dr. Gaddy's finding of "no discrete mass" during the examination of Plaintiff and the CT scan's confirmation of this finding, it is unlikely that Dr. Gaddy would have requested a guided needle biopsy. Dr. Hampton used his own professional medical judgment in interpreting the CT scan to determine that there was no discrete mass and then followed Dr. Gaddy's recommendations accordingly. Plaintiff fails to meet his burden of proving that the failure to contact Dr. Gaddy with the results of his CT scan constituted deliberate indifference.

Plaintiff claims that Defendants ignored treatment of his growth. As noted previously, in the two years prior to this claim, Plaintiff had been treated for many complaints, including both physical and psychological problems. Some of these claims proved to be unfounded, and others, including a benign cyst on Plaintiff's nose, did not require treatment beyond diagnosis. Beginning in June of 2002, Plaintiff saw a doctor or a nurse at least eighteen separate times specifically for complaints about the growth on his neck, was referred to a specialist, had two CT scans taken, along with multiple x-rays. Plaintiff may not have received the treatment he wanted or may have disagreed with the treatment he received, but the record indicates that his complaints were not ignored. See Davis, 992 F.2d at 153. Plaintiff's claim is not sufficient to demonstrate deliberate indifference.

Plaintiff also claims that all Defendants delayed his treatment, alleging that Dr. Hampton did not promptly discuss the CT scan results with him and that Dr. Babich did not promptly discuss the results of both CT scans with him. "When an inmate alleges that the delay in treatment is the constitutional deprivation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of the delay in treatment." Keeper, 130 F.3d at 1314-15. Plaintiff has been unable to show any injury he suffered as a result of this delay, and therefore fails

to meet his burden of showing that the delay constituted deliberate indifference.

Finally, Plaintiff alleges that all Defendants engaged in a conspiracy to cover up their deliberate indifference relating to his medical care. Aside from bald allegations, Plaintiff has provided no evidence that this alleged coverup ever existed. He thus fails to meet his burden of showing that the alleged coverup was a constitutional violation.

In addition to Dr. Hampton and Dr. Babich, Plaintiff alleges that Gale Bailey, a nurse at MCC, was also involved in the purported coverup of his medical treatment. In her position of Healthcare Administrator at MCC, Bailey reviewed and responded to Plaintiff's grievance related to the treatment of his growth. Defendants claim that Bailey was involved with Plaintiff's grievance following his treatment and never actually treated Plaintiff for the growth on his neck. In response, Plaintiff attaches three instances in his medical records where Bailey treated him. (Pl.'s Ex. M1-M3). The first instance is on January 1, 2004, when Bailey contacted Plaintiff's mother and informed her that Plaintiff was improving following his jaw fracture.[10] (Def.'s Ex. A at 195). The other two instances seemed to take place while Plaintiff was away on a follow-up visit with Dr. Graham on January 10. (Def.'s Ex. A at 215-16). None of these instances involve the treatment of Plaintiff for the growth on his neck, and Plaintiff has provided no evidence that she was personally involved in his treatment. While Plaintiff claims that Bailey was part of the alleged coverup regarding his condition, he also offers no evidence to support his assertion.

In sum, Plaintiff has failed to demonstrate that his growth is a serious medical condition. He has failed to show that Dr. Hampton and Dr. Babich were deliberately indifferent to his needs in treating the growth. He has also failed to show that Gale Bailey ever treated him for the growth.

---

[10]According to Plaintiff's later claims, his mother was supposedly either dead or dying from a rare rhabdomyosarcoma at this time. (Def.'s Ex. A at 381).

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [doc. # 36] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment [doc. # 33] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Complaint is **DISMISSED** with **PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Injunctive Relief [doc. # 55] is **DENIED as Moot.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Re-Hear Motion for Protective Order [doc. # 58] is **DENIED as Moot.**

An appropriate order of dismissal will accompany this Order.

Dated this <u>1st</u> day of August, 2005.

/s/ E. Richard Webber
E. RICHARD WEBBER
UNITED STATES DISTRICT JUDGE